# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION

JAMES R. COZART,           )
                                         )
           Plaintiff/Appellant,     )  Shelby Circuit No. 154806 R.D.
                                         )
VS.                               )  Appeal No. 02A01-9810-CV-00285
                                         )
LYNN ANNE COZART,      )
                                         )
           Defendant/Appellee.    )

**FILED**

August 27, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

### APPEAL FROM THE CIRCUIT COURT OF SHELBY COUNTY
### AT MEMPHIS, TENNESSEE
### THE HONORABLE JAMES R. RUSSELL, JUDGE

**CHARLES A. SEVIER**
**SEVIER LAW FIRM, P.C.**
Memphis, Tennessee
Attorney for Appellant

**LEE ANN PAFFORD DOBSON**
**RIKARD & DOBSON, P.L.L.C.**
Germantown, Tennessee
Attorney for Appellee

**AFFIRMED IN PART, REVERSED IN PART,
MODIFIED AND REMANDED**

                                                  **ALAN E. HIGHERS, J.**

**CONCUR:**

**W. FRANK CRAWFORD, P.J., W.S.**

**DAVID R. FARMER, J.**
       This case concerns the divorce of James R. Cozart ("Husband") and Lynn Anne

Cozart ("Wife"). Husband has appealed from the trial court's final decree of divorce and from its disposition of Husband's subsequent motion to alter or amend. He alleges that the trial court erred by failing to make an equitable division of marital assets under the circumstances, including the trial court's treatment of certain contractual benefits that arise from his employment as a Nationwide insurance agent, and including the trial court's mandate that Husband pay for the cost of a new vehicle for Wife. He also alleged that the trial court erred by requiring Husband to pay Wife rehabilitative alimony of $425 per month for 30 months and, and by preventing Husband from borrowing against the cash value of his life insurance policy. For the reasons hereafter stated, we affirm in part, reverse in part, and modify as hereafter provided.

## FACTS AND PROCEDURAL HISTORY

Husband and wife, who were both parties to prior marriages, were married in October 1982 and separated fourteen years later in November 1996. They were ultimately divorced in this action by a final decree of divorce on September 3, 1998 (sixteen years after their marriage). Husband originally commenced this action by filing a complaint for divorce on February 18, 1997, after which Wife filed an answer and counter-complaint on March 12, 1997. As grounds for divorce, Wife's counter-complaint asserted, among other things, that Husband had committed adultery, which was later stipulated by Husband.

As of the time of trial, which was in July 1998, Husband's age was fifty-five, and Wife's age was forty-one. Two children, ages eleven and seven, were born of the marriage. The testimony presented at trial revealed that both parties are in general good health, with the exception that husband is a diabetic, which limits his ability to obtain life insurance coverage. Husband possesses a college degree, and Wife has a high school diploma along with some college hours received toward a degree.

At trial, the parties agreed that the fair market value of the parties' marital residence, which was occupied by Wife, was $68,500. After taking into account a $41,015 mortgage,

2

the equity in the house at the time of trial was $27,485. Also, the parties agreed to a division of personal marital property whereby Husband received personal property with a total value of $8,590, and Wife received personal property with an total value of $6,867.00. Husband had an IRA with a $37,174 value, and Wife had a 401k plan through her employment at Behavior Technology valued at $1,640. Additionally, Husband had a life insurance policy in the face amount of $123,940 with a present cash surrender value of $11,819. He also had a term life insurance policy in the face amount of $20,000, though this term policy had no cash value. Wife had a life insurance policy in the face amount of $59,536 with a present cash surrender value of $9,536.

The parties agreed that the marital estate also included the "value" of the Cozart Insurance Agency, which is a Nationwide Insurance agency that was founded shortly after the parties moved to Memphis, Tennessee in 1983. Throughout the existence of this business until shortly before the parties' divorce, both parties devoted considerable time and effort to the development and operations of the business (though Wife began working elsewhere at Husband's insistence at some point shortly before the parties' separation and subsequent divorce). Husband became a Nationwide Insurance Company agent, and while Wife became partially licensed as an insurance agent, her primary involvement with the agency was administrative in nature.

At trial, the parties agreed that the value of the Cozart Insurance Agency as a marital asset should be based upon Nationwide's "Agent's Security Compensation Plan" (hereafter "Security Plan"), which involves two benefits that accrue to Nationwide Insurance agents (*i.e.*, Husband) and that generally would be paid to an agent if the agent's "Agent Agreement" with Nationwide is cancelled, whether by retirement, death, disability, or otherwise.[1] First, Nationwide's Security Plan includes an "Extended Earnings" benefit, which represents the value of an agent's business on his books (referred to by the parties as "book of business"). The amount of the Extended Earnings benefit is established by

---

1. In order to be eligible to receive the benefit payments, however, the Agent Agreement must not have been cancelled because of the agent's "inducing or attempting to induce -- either directly or indirectly -- any policyholder to lapse, cancel, or replace any insurance in force" with Nationwide.

Nationwide, and is based upon each prior year's insurance policy renewal service fees. In 1998, the amount of Husband's Extended Earnings benefits was based only upon renewal service fees that were received in 1997. At trial, the parties agreed that, in accordance with Nationwide's valuation, the value of this benefit was $154,830.

The second benefit that accrues to Nationwide Insurance agents (*i.e.*, Husband) under Nationwide's Security Plan is "Deferred Compensation Incentive Credits" (hereafter "DCI Credits"). The amount of DCI Credits accumulated by an agent is equivalent to a dollar amount that will be paid to the agent upon the cancellation of the agent's Agent Agreement. Additional DCI Credits are earned by Nationwide agents each year and accumulate until the agent reaches age 65. The DCI Credits benefit is not payable until after an agent reaches age 50. If an agent elects to receive the DCI Credits benefit at any time prior to age 60 for any agency cancellation not resulting from death or disability, the amount of the benefit is subject to a discount factor. In this case, the parties agreed that Husband's accrued DCI Credits totaled 133,423 at the time of trial. The monetary equivalent to this amount, $133,423, will be paid to Husband after the cancellation of his Agent Agreement with Nationwide, assuming such cancellation occurs after age 60. If Husband had cancelled this Agent Agreement (*i.e.*, terminated his Nationwide insurance business) at the time of trial (at age 55), his DCI Credits would have been subject to a discount factor that would have yielded a monetary sum equivalent to only 74.73 percent of his total DCI Credits. In other words, the value of the DCI Credits at the time of trial was $99,707 (133,423 x .7473).

Both parties agreed at trial that, in order to reach an equitable division of marital assets, Wife's share of the marital estate should account for a fifty percent interest in the value of Husband's Nationwide Security Plan benefits (both Husband's Extended Earnings and his DCI Credits) that had accrued as of the time of trial. The parties were not, however, able to agree to any equitable arrangement whereby Wife would receive payment for these benefits. At trial during direct examination by her attorney, however, Wife was asked and answered the following with regard to the DCI Credits:

4

> Q. All right. Now, you do understand, though, in the deferred compensation that truly is not paid out until he does retire or is disabled?
> A. Correct.
> Q. Okay. Are you willing to wait until those events happened just like a normal retirement plan?
> A. Yes, I am.
> Q. Are you asking him to pay you that at this time?
> A. No.

Similarly, during cross-examination by Husband's attorney, Wife testified as follows:

> Q. In your request for half of the $90,000 approximately in the agent's incentive credit plan, you realize that there's no place to get that money from him until he draws it?
>
>                               . . . .
> A. Are you talking about the deferred comp, the DCIC?
> Q. Yes.
> A. Yes. I understand that he won't get that until he retires, and I'm willing to wait until he retires to get my share.

Both parties also agreed, and the trial court ordered, that custody of the parties' minor children would be awarded to Wife, with liberal and reasonable visitation to Husband, and with child support set by agreement at $1,600 based upon Husband's income as an insurance agent and based upon Tennessee's Child Support Guidelines.

Ultimately, the trial court ordered, through its final decree of divorce and its subsequent order disposing of Husband's motion to alter or amend, the following as to the division of the parties' marital estate:

1. that the marital residence located at 1113 Colonial Rd., Memphis, which had an equity value of $27,485 (representing fair market value minus the outstanding mortgage debt), be awarded to Wife;[2]

2. that Husband sell an Airstream trailer, which had a value of $3,000 and was part of Husband's $8,590 of personal property, with the proceeds of such sale to be used "to repair whatever needs repairing at the parties' marital home, limiting said items in need of repair as described in the trial of this cause,[3] with the remainder of said proceeds, if any, to be awarded to [Husband]";

3. that Husband "obtain a new vehicle ... for ... Wife ... at no cost to her ... and that the notes on said vehicle shall be paid by the Insurance Agency until paid in full ...";[4]

2. Wife was required, however, "to hold [Husband] harmless and indemnify him from any debt or obligation in connection with the ... marital residence."

3. Wife had testified that there existed several conditions at the parties' marital home that required repair, and that the estimated cost to repair said conditions was $1,300. Accordingly, this "allocation" of marital assets had the net effect of increasing Wife's share by $1,300, and reducing Husband's share by $1,300.

4. The trial court found, based upon Wife's testimony, that Wife was "in need of a reliable new vehicle." This finding was based upon the age and mileage of the van that she had been driving, the van's prior service history, and the fact that the van's air-conditioning was not functioning and would be costly to repair.

4. that Wife transfer title to the van that was in her possession, which had an approximate trade-in value of $1,880 to Husband at the time when Husband furnishes Wife the new vehicle referred to above;

5. "[t]hat Wife's 401k Plan, having a value of $1,640, be awarded to her";

6. that Husband's $37,174 IRA "be divided equally between the parties via a Qualified Domestic Relations Order";

7. that a credit union account, having an approximate value of $1,500, be awarded to Wife; and

8. that Husband "assign one-half the value of his Extended Earnings Benefit with Nationwide and one-half the value of the DCIC Deferred Compensation Plan with Nationwide to [Wife], said value to be determined at the time of draw-down or at the time [Husband] elects to receive either the Extended Earnings Benefit or the Deferred Compensation Plan, or both, under the rules established by Nationwide.

As to the last item, which addressed Husband's Nationwide Security Plan benefits, the trial court's final decree of divorce expressly stated, "The Court finds that [Husband] is not in a financial position to pay [Wife] her percent of the value of either of [Nationwide's Security Plan benefits] in installments; the proof was that he was disapproved for a loan prior to the hearing on this divorce action."

Aside from the trial court's division of marital assets, the trial court further ordered Husband "to pay rehabilitative alimony to Wife ... of $425 per month for thirty months," and "to pay ... one-half of ... Wife's attorney fees ... , or $3,668.48." The trial court further ordered Husband "to maintain the life insurance coverage ... on his life in the present amount of $123,940 and the separate life insurance policy on his life in the amount of $20,000 through Nationwide, and he shall name his two minor children as beneficiaries on both policies until he is no longer obligated to the Wife for child support for said children."

On appeal, Husband's brief sets forth the following issues for this Court's review:

1. Whether the trial court erred in its "50 / 50" division of Husband's Security Plan benefits at the time of Husband's "drawdown," which may not occur until many years after the divorce decree?

2. Whether the trial court made an equitable division of assets, including its requirement for Husband to purchase a new vehicle for Wife, under the circumstances?

3. Whether the trial court erred in requiring Husband to pay Wife rehabilitative alimony of $425 per month for thirty months?

6

4.    Whether the trial court erred in preventing Husband from borrowing against the cash value of his life insurance policy?

ANALYSIS

I. Nationwide's Security Plan Benefits and the Division of Marital Assets

As to the first issue stated above, Husband's brief states, "The two Nationwide Insurance Company Benefit Plans were awarded fifty percent to [Wife] as agreed between the parties, but [Husband] assigns error to this action because the trial court valued the Plans at the time of drawdown, which may be ... years from the date of the divorce ...." For the sake of clarification, Husband does not contend that a deferred distribution of Wife's interest was error. Instead, he asserts that Wife should not be entitled to one-half of the full value of each Security Plan benefit at the time of "drawdown." In reviewing this "assignment of error," we find it appropriate to analyze the DCI Credits benefit and the Extended Earnings benefit separately.

As to the DCI Credits benefit, we begin by recognizing that this benefit is a retirement benefit. Even though this retirement benefit can, at an agent's election, be received either in periodic payments (as a "pension") or as a lump sum payment, we find that its treatment should not differ from other pension rights. In Kendrick v. Kendrick, 902 S.W.2d 918 (Tenn. App. 1994), this Court made the following observations regarding pension rights (i.e. retirement benefits):

> Any procedure used to value and distribute pension rights must be consistent with Tenn. Code Ann. § 36-4-121. This court has recognized four principles to assist in the process. First, pension rights accrued during a marriage will be classified as marital property even though the non-employee spouse did not make direct contributions to the increase in the pension's value. Second, only pension rights accruing during the marriage will be considered marital property. Third, the difficulty in valuing pension rights has no bearing on the classification of the pension as marital property. Fourth, the pension rights must be valued as of a date as near as possible to the final divorce hearing date.
>
> Like the courts in other states, this court has recognized two techniques for valuing and distributing pensions. The first technique is the present value method; the second is the retained jurisdiction or deferred

7

distribution method.

The present value method requires the court to place a present cash value on the pension interest acquired during the marriage. Once the court computes the present cash value of the pension rights, it awards the pension to the employee spouse and then awards the other spouse marital property of equal value. If the marital estate is insufficient to make an offsetting award, then the court may make an award payable in installments.

The retained jurisdiction method, as its name indicates, requires the court to retain jurisdiction over the case and to defer dividing the pension interest until the pension vests or matures. In some jurisdictions, the courts using this method determine the nonemployee spouse's share in advance and then enter an order identifying the portion that the spouse will receive if and when the employee spouse begins drawing his or her retirement benefits. The nonemployee spouse's share is commonly expressed as a fraction or a percent of the employee spouse's monthly pension benefit.

. . . .

The deferred distribution method has distinct advantages with regard to nonvested pension interests, especially when the risk of forfeiture is great. It equalizes the risk of forfeiture between the parties. It avoids the difficulties associated with attempting to place a present cash value on a nonvested retirement interest. It also avoids the problems caused when the marital estate does not contain sufficient property to make an offsetting award whose value is equal to that of the pension.

The choice of valuation method is a discretionary one, that depends on the facts of the case. However, the deferred distribution method is particularly suitable for nonvested ... pensions. This court has held specifically that the present value method is inappropriate when pension rights are nonvested, and has used the deferred distribution method to value and distribute a nonvested pension.

Kendrick, 902 S.W.2d at 926-27 (citations omitted).

As we explained earlier (and as the parties agreed), Husband's DCI Credits were capable of being valued as of the time of divorce, based upon the amount that Husband could have received at such time (assuming he canceled his Agent Agreement). Taking into account Nationwide's "discount factor" for Husband's age, Husband could have received $99,707. One-half of $99,707 (for the one-half interest awarded to Wife) would yield $49,853.50. The trial court correctly found, however, that the marital estate was insufficient to make an offsetting award with other marital property, *and* it would not have been practical to make an award payable in installments (Husband would have been unable to pay such installments based upon his income and expenses). Accordingly, the trial court did not err to the extent that it deferred distribution of Wife's interest until Husband's actual receipt of the benefit. The trial court did, however, err to the extent that

it ordered the payment of one-half of Husband's entire DCI Credits benefit upon Husband's actual receipt of the benefit. The DCI Credits benefit is structured such that DCI Credits are earned by Nationwide agents each year and continue to accumulate until the agent reaches age 65. DCI Credits that have already been earned do *not* accrue any interest, except to the extent that Nationwide's discount factor is reduced in each year between ages 50 and 60. In Husband's case, the 133,423 of earned DCI Credits, which would yield an actual benefit of $99,707 at age 55, will ultimately yield an actual benefit of $133,423.[5] Any DCI Credits that are subsequently earned and that are added to the 133,423 will entirely be the result of post-divorce activities of the husband. Because such subsequent amounts will not have been earned during the parties' marriage, they should not be considered marital property subject to division. Accordingly, we find that the trial court erred to the extent that it ordered the payment of one-half of Husband's *entire* DCI Credits benefit upon Husband's actual receipt of the benefit. The trial court should have, instead, based the deferred distribution only upon the 133,423 of earned DCI Credits. In order to accomplish this result, the following must be observed.

At the time when Husband's Nationwide Agent Agreement is canceled (*i.e.* when he retires, dies, or becomes disabled), the portion of the DCI Credits benefit subject to division and distribution as marital property can be calculated by dividing the number of DCI Credits earned during the marriage (133,423) by Husband's total DCI Credits. The product of this calculation will yield a multiplier, which should be used in conjunction with all subsequent DCI Credits benefit payments (whether they be periodic or lump sum). For example, if Husband's total DCI Credits at the time of agency termination is 250,000, the multiplier would be calculated by dividing 133,423 by 250,000, the product of which is .53369. As such, the portion of all benefit payments subject to division and distribution as marital property in this example would be 53.369 percent. If the benefit payment was in one lump sum payment of $250,000, the portion subject to division and distribution would

---

5. We find it relevant to simply note that the increase in value of the DCI Credits benefit between ages 55 and 60 is approximately equivalent to a six percent increase in value per year.

be $133,423.[6]$ If benefit payments were periodic, and each payment was in installments of $10,000, the portion subject to division and distribution would be $5,336.90. Under this approach, the "one-half" amount that was ordered by the trial judge for Wife to receive would be $66,711.50 for our lump-sum example, and $2,668.45 for our periodic payment example.

The Extended Earnings benefit, which represents the value of an agent's business on his books during any given year, is entirely different from the DCI Credits benefit, however. The value of the Extended Earnings benefit during one year does not automatically carry over into the next year. Instead, the Extended Earnings benefit for any given year is based solely upon the prior year's insurance policy renewal service fees. There is no value that automatically carries over from year to year, and the value of the Extended Earnings benefit is not certain to increase from year to year. In fact, the Extended Earnings benefit generally would not increase in value over successive years absent additional efforts by the insurance agent. Moreover, common reasoning suggests that the value that is specifically derived from one prior given base year would diminish over subsequent years, because: (1) not all of the same insurance policies that were once renewed in the prior base year will be renewed in subsequent years; and (2) subsequent renewals would likely require some amount of additional effort in order to maintain the business (diminishing the relative value that can be attributed to the prior base year). The Extended Earnings benefit is also different from the DCI Credits benefit because the value of the Extended Earnings benefit relates to: (1) future earnings (commissions and/or fees) that can reasonably be expected to be received by the insurance agent in the following year(s); and / or (2) the amount that can be received by the agent in consideration for the forfeiture of his ability to receive these future earnings by termination of his Nationwide agent status. This inherent connection to an agent's future earnings causes us to raise two pertinent inquiries. First, should the Extended Earnings benefit even be considered as part of the marital estate? Second, if this benefit is deemed to be part of the marital estate,

6. This, of course, assumes that the benefit payment is received after age 60, whereby the benefit payment would not be subject to a "discount factor." The correct result will still be reached however, if the benefit payment is received before age 60 and is reduced by a discount factor.

should the fact that the benefit relates to Husband's expected future income be considered when making an equitable division of the marital assets and when determining alimony? We find that the answer to each of these questions, under the unique circumstances of such a contractual arrangement, is yes.

As to the our first inquiry, we have already noted that both parties agreed that the value of the business (the Extended Earnings amount) should be treated as a marital asset. Moreover, this Court has previously found a substantially identical benefit to be marital property. In Ray v. Ray, 916 S.W.2d 469 (Tenn. App. 1995) this Court's middle section stated the following regarding this type of contractual benefit:

> We are ... mindful that other states have decided that the termination rights of identical contracts have no value for division as marital property. *See Lawyer v. Lawyer*, 288 Ark. 128, 702 S.W.2d 790 (1986) and *In re Marriage of Frazier*, 125 Ill. App. 3d 473, 80 Ill. Dec. 838, 466 N.E.2d 290 (1984). Both courts focus on the fact that the actual value of the contract depends on the post-divorce activities of the husband. We accept that as true, but we choose not to adopt the conclusion that, for that reason, the wife should be denied any interest whatsoever in such a substantial asset.

Ray, 916 S.W.2d at 470. In Ray, as in this case, the value of the insurance agent's business on the books had actually resulted from the agent's efforts and activities during the marriage. Therefore, this Court found, as we do here, that the value of the contractual right to receive payment was properly considered as a part of the marital estate. In Ray, however, the contractual benefit representing the value of the agent's business was awarded to the agent in order to reach an equitable division of marital assets. *Id.* By doing so, only the agent would receive the benefit or detriment of any subsequent increase or decrease in the benefit's value resulting from his efforts. In this case, the trial court ordered that each party receive one-half the value of the Extended Earnings benefit upon "drawdown." We conclude, however, that, due to the unique nature of such a contractual benefit, courts should allocate the full value of such an "asset" to the agent, and award other offsetting assets to the non-agent spouse, where it is practical to do so. We further conclude that, in this case, the trial court could have made such an equitable division.[7]

---

7. Because we have concluded that such an equitable division could have been achieved in the instant case, based upon our review of the entire record before us, we find it unnecessary to resolve whether, as a matter of law, it was improper for the trial court to award Wife with a future interest in Husband's Extended Earnings, which would have been inherently related to rights earned after the marriage.

11

Accordingly, we hereby reverse and modify the trial court's division of the marital estate in the following respects:

1.     that all proceeds from the sale of the parties' Airstream trailer (and not just the proceeds used to repair the parties' marital home) be awarded to Wife and, in the event that the Airstream trailer has not yet been sold, that it be awarded to Wife for such use or disposition as she deems fit;[8]

2.     that the full $37,174 value of Husband's IRA be awarded to Wife;[9]

3.     that Husband assign the full value of the DCI Credits benefit under Nationwide's Security Plan to Wife to the extent that such benefit was earned during the parties' marriage, with such an amount to be determined in accordance with this opinion as set forth above;[10] and

4.     that Husband retain the full value and interest in the Extended Earnings benefit under Nationwide's Security Plan.[11]

While the net effect of these modifications is an approximate decrease in Wife's share of $7,274.50 (and a corresponding increase in Husband's share of the same amount), Wife is still receiving a similarly greater share of the marital estate. While the trial court's division of the marital estate, which includes the cash surrender value of each parties' whole life insurance, would have provided Husband with a 46 percent share of the marital estate, and Wife with a 54 percent share,[12] our partial reversal and modification of the trial court's division will decrease Wife's share (and increase Husband's share) by only two percent.[13] We affirm the trial court's division of the marital estate in all other respects.

## II. Rehabilitative Alimony

The next issue raised by Husband is whether the trial court erred in requiring Husband to pay Wife rehabilitative alimony of $425 per month for thirty months. In support of his contention that the trial court did err, Husband asserts that his monthly income and

---

8.  The effect of this modification is a reallocation of approximately $1,700 from Husband to Wife.

9.  The effect of this modification is a reallocation of approximately $18,587 from Husband to Wife.

10.  The effect of this modification is a reallocation of approximately $49,853 from Husband to Wife.

11.  The effect of this modification is a reallocation of approximately $77,415 from Wife to Husband.

12.  Wife actually received a notably greater share of the marital estate pursuant to the trial court's order because our calculation of the parties' respective shares does not take into account the parties' vehicles and Husband's obligation to purchase Wife a new vehicle, which, on the aggregate, significantly increased Wife's relative share of the estate.

13.  *See supra* note 12.

expenses are such that an award of $425 per month alimony was excessive. Upon review of the entire record before us, however, we conclude that the trial court did not abuse its discretion in awarding rehabilitative alimony of $425 per month to Wife. Among other factors, we note Wife's testimony explained that she could not afford to pay for college night classes, but that she hoped to complete and obtain a college degree, that she had begun working towards the attainment of such a degree, and that such a degree would enhance her advancement and earning capacity at her current place of employment. The amount of alimony was based, in part, upon Wife's financial needs in order to complete this course work.

Wife also testified, however, that the successful completion of the course work that she had undertaken would lead to the attainment of such a degree in approximately two years. Therefore, we find the trial court's award of rehabilitative alimony for thirty months was excessive, and we hereby reverse and modify the court's award so that it shall be paid for twenty-four months instead of thirty, dating back to the entry of the trial court's final decree of divorce.

### III. Husband's Life Insurance Policy

The last issue remaining before this Court that Husband has raised and argued on appeal is whether the trial court erred in preventing Husband from borrowing against the cash value of his life insurance policy. At the conclusion of the trial in this case, the trial judge included among its oral rulings from the bench the following statement: "[Husband] will be enjoined and restrained from pledging, borrowing against or otherwise encumbering that policy or those policies." Such a restraint, however, was not included or addressed in the trial court's written final decree of divorce. Similarly, while Husband's motion to alter or amend the trial court's judgment in order "to allow him to borrow against the cash value of his life insurance" was "denied" insofar as it sought such relief, the order disposing of Husband's motion to alter or amend also did not include any such restraint. "A Court speaks only through its written judgments, duly entered upon its minutes. Therefore, no

13

oral pronouncement is of any effect unless and until made a part of a written judgment duly entered." Sparkle Laundry & Cleaners, Inc. v. Kelton, 595 S.W.2d 88, 93 (Tenn. App. 1979) (citing Massachusetts. Mut. Life Ins. Co. v. Taylor Implement & Vehicle Co., 138 Tenn. 28, 195 S.W. 762 (1917); Broadway Motor Co. v. Public Fire Ins. Co., 12 Tenn. App. 278 (1930)). *See also* Evans v. Perkey, 647 S.W.2d 636, 641 (Tenn. App. 1982) (quoting Sparkle, 595 S.W.2d at 93). As such, it is unnecessary for this Court to address the propriety of such a restraint, as the subject "restraint" was not "made a part of a written judgment duly entered."

## CONCLUSION

Accordingly, the trial court's final decree of divorce and subsequent order disposing of Husband's motion to alter or amend is hereby affirmed in part, reversed in part, and modified as set forth hereinabove. Further, this cause is hereby remanded to the trial court for any further proceedings as may be deemed necessary by the trial court in order to effectuate the terms set forth herein (*e.g.*, entry of a qualified domestic relations order as to the full $37,174 value of Husband's IRA). Costs on appeal are taxed equally to the parties, for which execution may issue if necessary.

_____
HIGHERS, J.

CONCUR:

_____
CRAWFORD, P.J., W.S.

_____
FARMER, J.

14